**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**FILED**

**May 17, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* Z.N. and D.N.

No. 17-0805 (Mineral County 16-JA-11, 12, 13)

**MEMORANDUM DECISION**

Minor children Z.N. and D.N.[1] were placed in foster care in November 2016 after enduring sexual and physical abuse by their mother's boyfriend. Their mother's parental rights were terminated in February 2017 due to her knowledge of this abuse. In April 2017, their father's rights were terminated without a post-adjudicatory improvement period based upon the circuit court's finding that he abandoned the children. Specifically, the father did not participate in the mother's abuse and neglect proceeding, made no effort to visit with Z.N. and D.N. for more than one year, and failed to meet his child support obligations. We now consider the father's appeal[2] and affirm the circuit court's termination of his parental rights.

Because this case does not present a new or significant issue of law, and for the reasons set forth below, we find it is proper for disposition as a memorandum decision pursuant to Rule 21(c) of the West Virginia Rules of Appellate Procedure.

**I. Facts and Procedural History**

The Department of Health and Human Resources (DHHR) filed the original petition involving these children following Z.N.'s hospital visit on June 13, 2016 while in the custody of his mother.[3] Z.N. had a bruised and swollen penis, bruising across the pelvic area, dark quarter-size bruises on both cheeks, a split in his bottom lip, and a bruise near his hairline. When asked by the physician and the Child Protective Services (CPS) Worker

---

[1] We follow our traditional practice in cases involving sensitive facts and use initials to identify the parties rather than their full names. *See In the Matter of Scottie D.,* 185 W.Va. 191, 192 n.1, 406 S.E.2d 214, 215 n.1 (1991).

[2] Petitioner (the father) is represented by Frank P. Bush, Esq. Respondent (DHHR) is represented by Lee Niezgoda, Esq. The guardian ad litem, Meredith H. Haines, Esq., filed a responsive brief on behalf of the children in support of the circuit court's order.

[3] The original petition did not include any allegations against the father, however, we note that at the time of its filing, he engaged in shared parenting time on an informal basis.

1

what caused the bruising, his mother offered only implausible explanations.[4]  CPS's interview of Z.N. was also futile.  He blamed his brother, D.N., for the bruising to his face but refused to provide any information regarding the bruising to his genital area.

Later that day, however, during an interview with the Mineral County Child Advocacy Center (CAC), Z.N. provided more information.  He told the interviewer that his mother coached him to say that her boyfriend "had not done anything [wrong]" and also disclosed that he had previously informed a family member of sexual and physical abuse by his mother's boyfriend.  After the interview, DHHR was awarded emergency custody of Z.N. and D.N. and they were placed with their great-grandmother.  At the preliminary hearing the following week, the circuit court found probable cause that the children were abused and neglected.  As a result, the children remained with their great-grandmother, but their mother and father were granted supervised visitation.

On July 14, 2016, the Multidisciplinary Team (MDT) agreed to return the children to the mother, so long as she agreed not to allow contact between the children and her boyfriend.  This custodial arrangement was terminated when she violated the terms of the safety plan only four days later.  At the resulting adjudicatory hearing on July 26, 2016, the court granted the mother's motion for a pre-adjudicatory period of improvement and the children were returned to her custody.  Although the father did not attend the hearing, the court granted his counsel's motion for supervised visitation.  The father also failed to attend the subsequent status hearing and failed to visit Z.N. and D.N. even once during this time, later simply claiming that he failed to do so because he was unaware that he was allowed to see them.

In October 2016, Z.N. and D.N. were removed from their mother's custody once again after disclosing in a second CAC interview that they were afraid of their mother's boyfriend because he physically and sexually abused them.  They also disclosed that their mother was aware of the abuse but allowed her boyfriend to have continued contact with them in violation of her agreement with DHHR.  As a result, DHHR filed an amended petition against the mother and her boyfriend.

In the same time period, a CPS Worker received a call from Z.N. and D.N.'s father who offered to provide information regarding the mother's drug use.  When asked whether he had noticed the bruising on the children, he stated that he'd previously questioned it, but thought the mother and her boyfriend provided adequate explanation.  The father agreed to meet with the CPS Worker and attend the hearing; however, he did neither of those things.  He later claimed that he was unable to attend due to hospitalization, but ultimately admitted this was untrue.

---

[4] During his interview with the CPS worker, the physician provided his professional opinion that the bruising could not have been caused by any of the reasons provided by their mother.

During the October 19, 2016 preliminary hearing, the court again found probable cause that the children were abused and neglected.[5] Z.N. and D.N. were placed in a kinship placement with their mother's boyfriend's father and stepmother. But on November 22, 2016—only one month later—they informed DHHR that they could no longer care for the children and Z.N. and D.N. were placed in a foster home in Grant County where they remain today.

Sometime in November of 2016, the father called the CPS Worker and inquired about his visitation. The petition alleges that once the father was informed that the children were in foster care, he did not ask why or question their wellbeing. On a subsequent call with the CPS Worker, the father agreed to provide his attorney with a letter outlining the issues he believed were occurring in the mother's home, but the CPS worker never heard from him again. At the dispositional hearing in February 2017, the circuit court ultimately terminated the mother's parental rights, finding—as this Court later affirmed—that she knowingly allowed them to be exposed to abuse, encouraged them to lie about the abuse, and continued the relationship with her boyfriend despite the allegations.

Two months later—on April 11, 2017—DHHR filed a corrected amended petition that included the father as an offending parent. The petition alleges that the father abandoned the children by barely participating in their mother's abuse and neglect proceedings,[6] not attempting to see them for several months (his supervised visitation was suspended due to non-participation), and failing to provide support as evidenced by his child support arrearages. Finally, the petition noted his recent arrest following a domestic incident with his then-girlfriend.[7]

Ultimately, the circuit court found that the father abandoned the children and that there was no reasonable likelihood that the conditions of abuse and/or neglect could be corrected. The circuit court determined that termination was necessary for the welfare of the children. The father now appeals the circuit court's order.

---

[5] On October 23, 2016, the mother's boyfriend pled guilty to two counts of child abuse resulting in bodily injury.

[6] The father only attended one hearing and two MDT meetings, missing a total of seven court dates and three MDT meetings.

[7] The father was charged with malicious assault, burglary, and threats to kidnap. Although this incident did not occur in the presence of his children, his girlfriend's children were present.

## II. Standard of Review

The dual standard we apply when reviewing abuse and neglect cases is clear:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.[8]

With these standards in mind, we consider the father's three assignments of error. First, he asserts that the circuit court erred in finding that he abandoned the children because, contrary to its determination, he did not act in a manner that indicated his clear intent to forego his duties and responsibilities as a parent. Second, the father asserts that the circuit court erred in finding that his partial child support arrearage, in and of itself, constituted neglect of his children. And, finally, he asserts that the circuit court erred in denying his motion for a post-adjudicatory period of improvement. We address each of these issues in turn.

## III. Discussion

As to the issue of whether the father abandoned Z.N. and D.N., West Virginia Code § 49-1-201 defines abandonment as "any conduct that demonstrates the settled purpose to forego the duties and parental responsibilities to the child." The father argues that there is insufficient evidence of specific instances that would justify termination of his parental rights; however, the record is replete with this very evidence.

At the June 28, 2017 adjudicatory hearing, the CPS worker testified that, despite her referral for visitation in October 2016, the father did not participate and did not return calls regarding visitation, meaning that he had not seen the children for at least seven

---

[8] Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

months. She further testified that the father could not provide stable housing as he was living in between the homes of his parents and girlfriend. Regarding child support, the CPS worker testified that the father was in arrears for $4,085.56 and that he had not made payments except through tax intercepts.

The father, however, testified that he did not visit the children during their mother's abuse and neglect proceedings because he was unaware of their location once they'd been removed from their mother's home and due to misrepresentations made to him by their mother. But the father agreed that it had been nearly a year since he last saw the children. The father further testified that he did not attend the mother's proceedings because she told him that there was no need for him to come because she was regaining custody of the children. The father then made a concerning allegation that CPS refused to allow him visitation until he provided information about their mother. Regarding the child support arrears, the father testified that he was unable to pay child support because he was unemployed due to a car accident and unable to return to work.

After hearing the evidence, the circuit court found that it was the father's own neglect to blame—and not any wrongdoing on the part of CPS—for his failure to see his children. At the dispositional hearing on July 25, 2017, the circuit court further delved into whether or not CPS prohibited the father from exercising visitation rights until he provided a statement regarding the mother. The CPS worker testified that the service provider sent her an email regarding her failed attempts to contact the father to set up visitation. The service provider then scheduled a visit for November 3, 2016 and informed the father by voicemail that he had until November 2, 2016 to confirm before she cancelled the session. The father called and texted the service provider on November 2, 2016 who, for reasons that are unclear, called the CPS worker to determine what she should do. Although the father met the deadline, the visitation was ultimately cancelled and the CPS worker told the service provider to have the father call her because she needed to speak to him before any more visits would be scheduled because of the cancellation.

Although the circuit court noted in its dispositional order that it was "troubled by what may have been a miscommunication regarding the scheduling of the [father's] visitation with the minor children in November, 2016", it ultimately found that, despite this issue, the evidence showed that the father failed to financially support the children and had absolutely no contact with them for approximately one year. Regarding visitation, the circuit court found that although what exactly happened between CPS and the father was unclear, he did not ask the circuit court to address the issue until he was forced to by the filing of the petition against him.

After a cumulative review of the evidence and testimony presented, as well as the father's history with the children, it is clear that the circuit court did not clearly err in its determination that the father abandoned the children.

Next, the father alleges that the circuit court erred in finding that his arrears in child support are alone sufficient to constitute abandonment; however, the circuit court's adjudicatory order makes clear that its finding was not based solely on the father's failure to meet his child support obligation. Because we agree with the circuit court's finding of abandonment for the multiple reasons set forth above, we need not consider whether the child support arrearage, in and of itself, would suffice.

Finally, the father alleges that the circuit court erred by denying his request for a post-adjudicatory improvement period. West Virginia Code § 49-4-610(2) permits a post-adjudicatory improvement period not to exceed six months, upon written motion, and only if there is a demonstration by clear and convincing evidence that the individual is likely to fully participate and no prior improvement period has been granted. Specifically, we have held that "[a]bandonment of a child by a parent(s) constitutes compelling circumstances to justify the denial of an improvement period."[9] Additionally, we have noted that "where an improvement period would jeopardize the interests of the child, for instance, an improvement period will not be granted."[10]

Having found that the circuit court did not err in finding that the father abandoned his children, we similarly find that the circuit court's denial of a post-adjudicatory improvement period was proper. This point is further solidified by the abusive and unstable home life these children have endured—having been sexually and physically assaulted and removed from their mother's home multiple times—and their pending adoption by the foster family who has cared for them for over a year. Furthermore, any clear and convincing evidence of the father's likelihood to improve is absent from the record before us.

For the reasons set forth above, this Court affirms the circuit court's finding that the father abandoned the children, as well as the resulting termination of his parental rights.

Affirmed.

**ISSUED: May 17, 2018**

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Menis E. Ketchum, II
Justice Allen H. Loughry, II
Justice Elizabeth D. Walker

---

[9] Syl. Pt. 9, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991).

[10] *In re Charity H.*, 215 W. Va. 208, 216, 599 S.E.2d 631, 639 (2004).