599 S.E.2d 631

**In re: CHARITY H., Courtney H. and Victoria H.**

**No. 31563.**

Supreme Court of Appeals of West Virginia.

Submitted: Feb. 10, 2004.

Filed: April 16, 2004.

210

Kevin C. Sponaugle, Franklin, for the Appellant Wanda S.

Marla Zelene Harman, Franklin, Guardian Ad Litem for the children, Charity H., Courtney H. and Victoria H.

Darrell V. McGraw, Jr., Attorney General, Charleston, C. Carter Williams, Assistant Attorney General, Petersburg, for the Appellee, State of West Virginia, Department of Health and Human Resources.

Marvin L. Downing, See & Downing, Moorefield, for the Appellee, Henry H.

**PER CURIAM.**

This is an appeal by Wanda S.[1] (hereinafter "Appellant") from a denial of motions for an improvement period and a decision to terminate parental rights to three children, Courtney H., Victoria H., and Charity H. The Appellant alleges that the lower court erred by denying her motions for a post-adjudicatory improvement period and a dispositional improvement period. Based upon this Court's review of the record, briefs, arguments of counsel, and pertinent authorities, we affirm the decision of the lower court and remand with directions to determine whether post-termination visitation between the Appellant and the children should be ordered.

## I. Factual and Procedural History

The Appellant and Henry H. are the biological parents of the three children at issue in this appeal, Courtney H., Victoria H. and Charity H.[2] On December 29, 2001, the Appellant transported the children to the State Police barracks in Pendleton County to report allegations of sexual abuse by Henry H., the biological father of the children.[3] Troopers Teter and Kingery of the West Virginia State Police informed the Appellant that she should seek medical and psychological examinations of the children; thus, the Appellant states that she took the children to Rockingham Memorial Hospital in Harrisonburg, Virginia, to be examined for evidence of sexual abuse on or about December 31, 2001. Although the Appellant alleges that a nurse informed her that an examination would be untimely since the children last visited with their father during Thanksgiving 2000, the hospital has no record of the visit. The Appellant next took the children to Winchester Medical Center for a physical examination on April 22, 2002. Forensic Nurse Brenda Adams examined the children and found evidence of sexual abuse and sexual assault in all three children.

On May 6, 2002, the Department of Health and Human Resources (hereinafter "DHHR"), through its Child Protective Services worker Cary Waybright, filed an abuse and neglect petition against the Appellant, Henry H., and John S., the Appellant's husband at that time. The petition alleged sexual abuse by Henry H. and further alleged that the Appellant was aware of the abuse but continued to permit the children to visit Henry H. The petition also alleged that the Appellant allowed the children to maintain contact with another known sexual offender, Jackie W., the Appellant's own father. Further, physical abuse, parental abuse of alcohol, and domestic violence were included in the petition.

The children were removed from their mother's custody and placed in foster care in Randolph County, where they have remained during the pendency of this action.[4] The DHHR amended the petition on July 24, 2002, to include allegations that John S. physically abused the children, that the Appellant failed to protect the children from

1. In cases involving sensitive facts, we adhere to our usual practice, referring to the parties by their last initials rather than by their complete surnames. *See, e.g., In re Michael Ray T.*, 206 W.Va. 434, 525 S.E.2d 315 (1999); *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 490 S.E.2d 642 (1997); *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

2. Courtney's date of birth is December 10, 1991; Victoria's date of birth is June 18, 1993; and Charity's date of birth is September 6, 1995.

3. Henry H. was indicted for these offenses in February 2003. Although his parental rights were also terminated, he is not a party to this appeal. Henry H. has previously been convicted of the offense of third degree sexual assault of a female victim in May 1994. The Appellant and Henry H. had one more child, Charity, after Henry H.'s conviction and were divorced in

1998. At the divorce hearing, the Appellant failed to seek a protective visitation order between the girls and their father, failed to advise the court of Henry H.'s status as a sexual offender, and agreed to regular visitation between the girls and their father. The Appellant has testified during the current proceedings that she did not advise the divorce court of the sexual offenses or seek supervised visitation because she could not imagine that a father would sexually abuse his own daughters, even though she admitted that she had been sexually abused by her own father, Jackie W.

4. The guardian ad litem for the children, Marla Zelene Harman, reports that the children have adapted well to the foster/pre-adoptive placement, that all three girls are special needs children, and that they have all been diagnosed with post-traumatic stress disorder, with the middle child showing hostage type symptomology.

that abuse; that the Appellant refused to pay for eye glasses for Courtney; that the Appellant threatened to commit suicide in front of the children; that the Appellant refused to treat the children's head lice; that there were fleas in the carpeting of the Appellant's place of residence; that John S. forced the children to sit of their hands for several hours as punishment for routine offenses;[5] that Henry H. forced the children to watch pornographic movies; that Henry H. engaged in sexual intercourse with the children; and that both Henry H. and Jackie W. are registered sexual offenders with whom the children have regular contact.

In a July 3, 2002, psychological report, Dr. Thomas Stein observed that his examination revealed that the Appellant suffered from post-traumatic stress originating from the sexual abuse she endured in her early adolescence. Although Dr. Stein noted that the Appellant had received some treatment from a licensed professional counselor and earlier treatment following the abuse in Braxton County, Dr. Stein concluded that "it is obvious to this psychologist that those treatments were ineffective in adequately addressing her post-traumatic stress condition." Dr. Stein opined that the Appellant's inability to protect her children originated in her underlying personality which developed from the sexual abuse she suffered as a child. Dr. Stein further explained that the Appellant had sufficient intellectual capacity to benefit from appropriate psychotherapeutic intervention and that the "in-home services related to child management would do nothing to address the issues of [the Appellant's] own previous sexual abuse and concomitant personality tendencies...." Dr. Stein concluded that the "likelihood of [the Appellant] fully and completely discharging her parenting responsibilities in an appropriate manner would be dramatically enhanced" after effective treatment. Unfortunately, Dr. Stein did not identify a time span in which improvement could be expected for the Appellant.

An adjudicatory hearing was held on August 5, 2002,[6] and the lower court issued an adjudicatory order on October 8, 2002,[7] finding that each of the children had been neglected and abused by the Appellant, Henry H., and John S. Specifically, the lower court found that Henry H. had sexually abused the children; that John S. had repeatedly physically abused the children; that the Appellant had consistently failed to take protective safety measures by exposing the children to sex offenders, by failing to timely submit the children for medical examinations, and by failing to seek appropriate psychological treatment for the children after the sexual abuse was revealed. The lower court further found that the Appellant had failed to protect the children from the harsh discipline and physical and emotional abuse inflicted by John S., their step-father. The court further emphasized that the Appellant had failed to acknowledge the extent of the abuse or its impact on the children. In an October 16, 2002, child case plan prepared by the DHHR, it was noted that the Appellant had previously failed to cooperate with offered services

---

5. The reports also indicated that John S. punished the children by forcing them to stand in the corner for long periods of time based upon perceived transgressions concerning food or the failure to obtain a hand stamp at school. The children had regularly arrived at school with bruises, and teachers reported that the children were afraid to get on the school bus to go home in the evenings. The children also reported being hit with flyswatters, wood, and a fishing pole. In 1999, the DHHR entered into a "safety contract" with the family subsequent to an incident in which John S. struck six-year-old Victoria's hands with a board because she had eaten cheese belonging to the Appellant. The Appellant, however, testified during the adjudicatory hearing that she could hardly remember that incident.

6. During the adjudicatory hearing, the lower court indicated that it wished to interview the children in chambers. On August 16, 2002, the children and their guardian ad litem were present with the lower court in chambers in Romney, West Virginia. Subsequent to this interview, the parties were provided with an audio tape of the interview by the court reporter. No order or other writing from the lower court addressed what determinations were made based upon the interview or how it influenced the lower court's ruling on the adjudicatory hearing issues.

7. The original October 8, 2002, adjudicatory order was not forwarded to counsel for the Appellant by the guardian ad litem, Marla Zelene Harman. Thus, a revised adjudicatory order, with slight corrections in the statement of facts, was entered on November 26, 2002.

and that she had repeatedly denied that she or John S. abused the children.[8]

On October 24, 2002, the Appellant divorced John S., and he was thereafter dismissed from these proceedings. On November 6, 2002, the lower court conducted a hearing on the Appellant's motion for a post-adjudicatory improvement period. The DHHR and the guardian ad litem opposed such motion. The Appellant testified with regard to her ability to fully participate in such improvement period. The lower court also heard the testimony of Ms. Toni Walters, the individual supervising the visits between the Appellant and her children. It appears from the record that Ms. Walters was affiliated with Try Again Homes and was not an employee of the DHHR. Ms. Walters supervised the visitations for approximately five to six months, and her reports indicated that the visitations had been successful and that the Appellant had behaved very appropriately. During the November 6, 2002, hearing, Ms. Walters testified that Cary Ours[9] of the DHHR expressed disapproval of the positive remarks made by Ms. Walters concerning the Appellant and indicated to Ms. Walters that "your reports are killing us." Ms. Walters was subsequently removed as the visitation supervisor.

Upon conclusion of the evidence on November 6, 2002, the lower court denied the motion for the post-adjudicatory improvement period, finding that the Appellant had received services for several years to little avail. Specifically, the lower court found that the Appellant failed to keep the children away from their grandfather, a registered sexual offender; failed to keep the children away from their father, a registered sexual offender; and failed to protect the children from the severe physical discipline imposed by John S., even after a "safety agreement" was entered into with the DHHR in August 1999 as a result of John S.'s unreasonable punishment of the children.

A dispositional hearing was conducted on December 9, 2002, and the lower court considered and denied the Appellant's motion for a dispositional improvement period based upon the absence of evidence that she could comply with the requirements of an improvement plan.[10] On January 6, 2003, the lower court entered a dispositional order, finding that the Appellant was unwilling or unable to provide for the children's needs and that she had failed to protect the children from abuse. The court further found that continuation in the home was contrary to the welfare of the children, that the DHHR had made numerous reasonable efforts to preserve the family, and that there was no reasonable likelihood that the conditions of neglect and abuse could be substantially corrected in the near future. The lower court consequently terminated the parental rights of both the Appellant and Henry H.

The Appellant appeals that determination to this Court, contending that the lower court committed reversible error by denying her motions for post-adjudicatory and dispositional improvement periods. The guardian ad litem and DHHR maintain that the lower court's decision was correct and in the best interests of the children since there is no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future. The guardian ad litem and DHHR further argue that the Ap-

---

8. According to the record in this matter, this family has received social services since approximately 1993 in Braxton and Pendleton Counties. The services have included RESA child service, Potomac Highlands Guild, counseling through a local mental health guild and the Catholic Church, Right from the Start Early Intervention, and Action Youth Care family preservation services on multiple occasions. Courtney had also received a consultation with psychologist Dr. Mario Dennis in 1996 concerning allegations that she had been sexually abused. Dr. Dennis and social workers had advised the Appellant at that time to keep the children away from the Appellant's father, Jackie W.

9. Cary Ours also appears in the evidentiary record as Cary Waybright.

10. In this regard, the lower court remarked as follows:

Failure to protect has brought us here today and ... to a large measure the Court believes that as far as the mother is concerned that boils down to failure to see. A failure to see her children being abused. A failure to see her children being neglected and that's the true essence ... of why we're here today.

pellant has remained in denial regarding the degree and nature of abuse that the children have endured, has failed to respond positively to rehabilitative services offered over many years, and has failed to demonstrate an ability to comply with terms which would be associated with an improvement period.

## II. Standard of Review

■ In appeals from abuse and neglect proceedings, this Court has consistently applied a standard of review subjecting conclusions of law to *de novo* review and findings of fact to the clearly erroneous standard. In syllabus point one of *In re Travis W.*, 206 W.Va. 478, 525 S.E.2d 669 (1999), this Court stated:

> " 'Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.' Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996)." Syllabus Point 1, *In re George Glen B.*, 205 W.Va. 435, 518 S.E.2d 863 (1999).

This Court further stated as follows in *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 490 S.E.2d 642 (1997): "The above standard of review requires deference by this Court to the findings of a circuit court in a civil abuse and neglect proceeding. The critical nature of unreviewable intangibles justify the deferential approach we accord findings by a circuit court." 200 W.Va. at 562, 490 S.E.2d at 649. In *In re Emily & Amos B.*, 208 W.Va.

325, 540 S.E.2d 542 (2000), this Court also acknowledged the deference owed to the lower court by stating that "the circuit court is the better-equipped tribunal" to make substantive determinations regarding termination of parental rights. 208 W.Va. at 340, 540 S.E.2d at 557 (rejecting allegation that incarceration should automatically result in termination).

## III. Discussion

■ During the pendency of an abuse and neglect proceeding, an individual facing potential termination of parental rights may move the presiding court for an improvement period at several stages of the proceedings. The Appellant in the present case requested an improvement period following the final adjudicatory hearing and again as a dispositional alternative. Statutory authority for these improvement periods is provided in West Virginia Code §§ 49–6–2(b) (1996) (Repl.Vol.2001), 49–6–5(c) (1998) (Repl.Vol. 2001), and 49–6–12(b) (1996) (Repl.Vol.2001). West Virginia Code § 49–6–12(b)(2) specifies that entitlement to an improvement period is conditioned upon the ability of the parent/respondent to demonstrate "by clear and convincing evidence, that the respondent is likely to fully participate in the improvement period. . . ." In *State ex. rel Virginia M. v. Virgil Eugene S.*, 197 W.Va. 456, 475 S.E.2d 548 (1996), this Court specified that the most recent statutory enactments clarify that the burden of proof falls upon the parent requesting an improvement period. In footnote nine of *Virginia M.*, this Court explained as follows:

> We note that West Virginia Code § 49–6–12 (1996), recently enacted by the West Virginia Legislature, now requires a parent seeking an improvement period in cases of neglect or abuse to file a written motion requesting it, and to demonstrate by clear and convincing evidence that he or she is likely to fully participate in the improvement period. Thus rather than presuming the entitlement of a parent to an improvement period, as under *Cheryl M.*, . . . the law now places on the parent the burden of proof regarding whether an improvement period is appropriate.

197 W.Va. at 461 n. 9, 475 S.E.2d at 553 n. 9.[11]

Both statutory and case law emphasize that a parent charged with abuse and/or neglect is not unconditionally entitled to an improvement period. Where an improvement period would jeopardize the best interests of the child, for instance, an improvement period will not be granted. As the pertinent part of syllabus point seven of *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991), succinctly emphasizes,

> "[C]ourts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened...." Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

*See also In re Erica C.*, 214 W.Va. 375, 589 S.E.2d 517 (2003). Additionally, if a parent is unable to demonstrate an ability to correct the underlying conditions of abuse and/or neglect in the near future, termination of parental rights may proceed without the utilization of an improvement period. *See* W. Va.Code 49–6–5(a)(6) (1998) (Repl.Vol.2001). Syllabus point seven of *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996), accentuates this concept, as follows:

> " 'Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, *W.Va.Code*, 49–6–5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under *W.Va.Code*, 49–6–5(b) [1977] that conditions of neglect or abuse can be substantially corrected.' Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980). Syllabus point 4, *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537

(1989)." Syllabus Point 1, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993).

Termination of parental rights is also authorized where a parent contends nonparticipation in acts giving rise to the termination despite the existence of clear and convincing evidence that such nonparticipating parent knowingly took no action to prevent or stop such acts to protect the child. In syllabus point two of *In re Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991), this Court explained as follows:

> Termination of parental rights of a parent of an abused child is authorized under *W.Va.Code*, 49–6–1 to 49–6–10, as amended, where such parent contends nonparticipation in the acts giving rise to the termination petition but there is clear and convincing evidence that such nonparticipating parent knowingly took no action to prevent or stop such acts to protect the child. Furthermore, termination of parental rights of a parent of an abused child is authorized under *W.Va.Code*, 49–6–1 to 49–6–10, as amended, where such nonparticipating parent supports the other parent's version as to how a child's injuries occurred, but there is clear and convincing evidence that such version is inconsistent with the medical evidence.

*See also* Syl. Pt. 3, *In re Betty J.W.*, 179 W.Va. 605, 371 S.E.2d 326 (1988) ("W.Va. Code, 49–1–3(a) (1984), in part, defines an abused child to include one whose parent knowingly allows another person to commit the abuse. Under this standard, termination of parental rights is usually upheld only where the parent takes no action in the face of knowledge of the abuse or actually aids or protects the abusing parent").

A parent's right to an improvement period is carefully defined because the pre-eminent concern in abuse and neglect

---

11. The *Cheryl M.* reference is to *State ex rel. West Virginia Dept. of Human Services v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987), holding that a parent may move for and be granted an improvement period "unless the court finds compelling circumstances to justify a denial." 177 W.Va. at 691, 356 S.E.2d at 184. In this vein, we hasten to point out that this Court's prior inquiries into what may constitute "compelling circumstances," such as in *In re Darla B.*, 175

W.Va. 137, 331 S.E.2d 868 (1985), were based upon language in a former version of West Virginia Code § 49–6–2, prior to 1996 amendments, which stated that a court was to provide an improvement period unless compelling circumstances indicated otherwise. With the deletion of such language from the statute, the compelling circumstances concept is no longer relevant to this Court's investigation.

proceedings is the best interest of the child subject thereto. *See* Syl. Pt. 3, *In re Michael Ray T.*, 206 W.Va. 434, 525 S.E.2d 315 (1999) (" 'Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren).' Syllabus point 7, *In re Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 (1995)."). As this Court emphasized in syllabus point three of *In re Katie S.*, " '[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children.' "

In *West Virginia Department of Health and Human Resources ex rel. Wright v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996), this Court addressed a situation similar to the one at bar, stating that:

> [I]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

197 W.Va. at 498, 475 S.E.2d at 874. The lower court in the present case specifically stated that "I don't believe that her submissiveness or failure to be assertive can be corrected in any period of time that a[n] . . . improvement period might allow us." That is precisely the type of factual determination to which this Court must give deference on appellate review.

Based upon the above precedent, as well as our review of the entire record in this case, it is clear that the Appellant failed to present evidence to demonstrate that there was a reasonable likelihood that the conditions of abuse and neglect suffered by her children could be substantially corrected in the near future. Given the Appellant's refusal to acknowledge the seriousness of the continuous abuse her children have suffered, we uphold the lower court's conclusion that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the near future. The Appellant has simply failed to demonstrate any ability to protect her children from further abuse.

■ We further conclude that the lower court did not abuse its discretion by denying the requested improvement periods. The lower court's termination of the Appellant's parental rights was supported by clear and convincing evidence and was not clearly erroneous. Finally, we find that the lower court acted in the best interest of the children throughout the underlying proceedings.

## IV. Relevant Concerns

While the evidence before the lower court undoubtedly justified its conclusions,[12] and we consequently affirm, there are troubling components of this case that should not elude inquiry. One such issue is the apparent absence of any services directly aimed at remedying the Appellant's underlying personality characteristics which apparently led to her inability to protect her children. An extensive array of in-home parenting services were provided and are documented in the

---

12. The lower court quite obviously struggled earnestly with this case. With regard to the Appellant's motion for a post-adjudicatory improvement period, the lower court explained as follows:

> I frankly wanted to try to find some evidence that would convince me that it should be granted, but I think we have to look at the—at the prior experience that has been made here based upon the services that were rendered to her previously and whether or not the referrals were substantiated or not. The fact remains that services had been rendered to [the Appellant] for a number of years, for at least nine years, and they appear to have done little if any good.

> She acknowledges that her latest husband, John, was abusive after the services were rendered. She also acknowledges that she was told to keep the girls away from her father, but yet didn't, knowing that he is a sexual offender, and that she entered into a safety agreement as late as 1999. She says that she's willing to cooperate to do all these things, but her prior experience would—would indicate that she will not follow up with that. Consequently, I cannot grant her motion for an improvement period and would find the basis for same is that her prior refusal to comply with services that have been offered to her.

record. Yet, these services were not specifically devised to address the Appellant's real deficiencies. It is fundamentally unfair to castigate the Appellant for failure to improve when the services offered to her were not designed to promote improvement in the specific target area in which she was most deficient. Dr. Stein's opinion indicated that the Appellant could quite possibly, at some unknown point in the future, gain enough confidence and mastery over her own abusive past to become an adequate parent to her daughters. While we are concerned with this situation, the record compels the conclusion, as stated above, that there is no reasonable manner in which to calculate when or if the Appellant would attain that ability. Thus, the lower court's determinations cannot be deemed erroneous.

Equally troubling in this case is the allegation that a caseworker for the DHHR expressed disapproval of a visitation supervisor's report which cast the Appellant in a positive light. Such expression of displeasure insinuates an adversarial position or an antagonistic approach which is inconsistent with the intended goals and methodology of the DHHR as an entity. West Virginia Code § 49–6D–2 (1984) (Repl.Vol.2001) specifies that the DHHR's services are intended to provide a mechanism through which "family ties" will be preserved and strengthened where possible, "while recognizing both the fundamental rights of parenthood and the State's responsibility to assist the family in providing the necessary training and education of all children. . . ." The legislature has provided for "the offering of opportunities by the department whereby parents, guardians or custodians and their children may avail themselves of public and private resources offering programs and services which are primarily preventive and nonpunitive and *geared toward a rehabilitation of the home and a treatment of the underlying*

*factors which cause or tend to cause abuse and neglect. . . . "* W. Va.Code § 49–6D–2(b)(1) (emphasis supplied). The legislature also states that the DHHR's objectives shall be carried out in a manner which ensures that assistance will be provided "without fear by the citizens that the State's exercise of that responsibility will be unfairly used as a means of terminating family ties[.]" W. Va. Code § 49–6D–2(b)(6). The praise of failure and the deprecation of success are concepts completely incongruous with the stated legislative purpose of providing nonpunitive assistance and insulating the parent from fear that the State will use its power unfairly.

We further note that the Appellant was frequently encouraged by the DHHR to separate herself and her children from her husband John, due to his abusive tendencies. She accomplished this goal by divorcing John, possibly in the expectation that the divorce would enhance the possibility of regaining custody of her children. The record also reflects, however, that the Appellant and John may still maintain a relationship of some nature.

V. Right to Continued Association

 The record clearly reveals that an emotional bond exists between the Appellant and her children. Throughout the proceedings, the visitations have progressed well, and the children have expressed interest in continuing to maintain a relationship with their mother.[13] Based upon this emotional bond, as well as the efforts demonstrated by the Appellant with regard to counseling, divorcing her husband, and actively seeking a relationship with her children, the lower court, upon remand, shall examine the emotional bond between the Appellant and her children. The lower court may grant the Appellant post-termination visitation with the children, provided that such continued relationship is in the children's best interests and

---

13. The Appellant energetically participated in regular visitations with the children, as scheduled by the DHHR. Toni Walters, as supervisor of the visits, indicated that the time the mother spent with the girls was very beneficial and productive. The supervisor indicated in one of her visitation reports that she was "impressed with how the visits are going." "This supervisor has only been able to report positive things about this family." The supervisor stated that the children "adore" their mother, that the mother engages in " 'hands on' interactions during the visits," that she "brings a picnic lunch, not McDonalds, but the things to make sandwiches together." The supervisor stated that she was "impressed with this family and feels positive about the reunification."

"would not unreasonably interfere with their permanent placement." *State ex rel. Amy M. v. Kaufman,* 196 W.Va. 251, 260, 470 S.E.2d 205, 214 (1996). As this Court explained in syllabus point eight of *In re Katie S.,*

> "When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest." Syllabus Point 5, *In re Christina L.,* 194 W.Va. 446, 460 S.E.2d 692 (1995).

198 W.Va. at 82, 479 S.E.2d at 592; *see also* Syl. Pt. 11, *In re Jonathan G.,* 198 W.Va. 716, 482 S.E.2d 893 (1996) ( "A child has a right to continued association with individuals with whom he has formed a close emotional bond, including foster parents, provided that a determination is made that such continued contact is in the best interests of the child").

Thus, upon remand, the lower court is instructed to hear argument from all parties on this issue of post-termination visitation and take additional evidence, if necessary, to determine whether continued visitation or other contact with the Appellant is in the best interests of the children.

### VI. Conclusion

For the reasons set forth above, the final order of the Circuit Court of Pendleton County is affirmed, and this case is remanded with directions.

Affirmed and remanded with directions.

Justice DAVIS dissents and reserves the right to file a dissenting opinion.

1. This woman likewise did not receive a preadjudicatory improvement period. She filed a motion for a pre-adjudicatory improvement period, but then withdrew the motion at the adjudication hearing.

DAVIS, J., dissenting.

In this case the majority has affirmed a decision of the circuit court terminating a mother's parental rights without first giving her the benefit of either a post-adjudicatory or pre-disposition improvement period.[1] Given the particular facts presented in this case, the result reached by the majority is simply wrong. I strongly believe that the appellant, Wanda S., was entitled to the benefit of an improvement period before the decision to terminate her parental rights was made. For this reason, I dissent.

While the evidence in this case makes clear that past efforts to provide services to Wanda S. had not been successful, the record is equally clear that the services in no way addressed Wanda S.'s fundamental problem, her post-traumatic stress condition. As the majority opinion recognizes, a psychological report filed by Dr. Thomas Stein opined that Wanda S.'s "inability to protect her children originated in her underlying personality which developed from the sexual abuse she suffered as a child." Maj. op. at 4. Dr. Stein concluded that the "likelihood of [Wanda S.] fully and completely discharging her parenting responsibilities in an appropriate manner would be *dramatically enhanced"* following effective treatment.

I believe that Dr. Stein' conclusions, when considered along with the steps this woman did take to protect her children, i.e. reporting their sexual abuse when she became aware of it, divorcing her abusive husband, and the positive reports generated from her visits with her children following their removal from her home, constitute clear and convincing evidence that Wanda S. was "likely to fully participate in the improvement period . . . ." W. Va.Code § 49–6–12(b)(2) (1996) (Repl.Vol.2001). Consequently, Wanda S. should have been granted an improvement period before any decision of whether or not to terminate her parental rights was made.[2]

2. When considering the result reached in this case in connection with another case rendered this Term of Court the message the majority seems to be sending is that when a young man is subjected to sexual abuse as a child, and as a

220

In view of the foregoing, I respectfully dissent.

result thereof he becomes a sexual predator who prays on young children, he is deserving of every conceivable chance that may be given him. Conversely, when a woman has been subjected to sexual abuse as a child, and as a result thereof she does not become a sexual predator, but by virtue of the emotional scars of her abuse finds herself unable to protect her children from abuse at the hands of others, she is not deserving of a reasonable chance to receive appropriate psychotherapeutic intervention prior to having her parental rights to her children terminated.